

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHNATHAN LEE X SMITH,

    Plaintiff,

v.                                        Civil Action No. 3:12CV45

UNITED STATES CONGRESS, et al.,

    Defendants.

## MEMORANDUM OPINION

Johnathan Lee X Smith ("Mr. Smith"), a Virginia inmate, has submitted this civil action.

The matter is proceeding on Mr. Smith's Fourth Amended Complaint ("the Complaint," ECF

No. 47). In the Complaint, Mr. Smith raises the following claims:[1]

Claim 20    Defendants Clarke, Jabe, Cei, Jones Express Music, Garman, Dillman, Faith Review Committee, Dabb, and Gray deprived Plaintiff of an opportunity to purchase and receive compact discs of sermons by Minister Farrakhan at Green Rock Correctional Center from August 11, 2009, until January 21, 2010, in violation of the [(a)] First Amendment[2] and [(b)] [the Religious Land Use and Institutionalized Persons Act "RLUIPA"].[3]

(Compl. 1.)[4]

---

[1] In his prior complaints, Mr. Smith improperly attempted to join a number of transactionally unrelated claims, and the Court dismissed the unrelated claims. *See Smith v. U.S. Congress*, No. 3:12CV45, 2013 WL 3199684, at *2–3 (E.D. Va. June 21, 2013); *Smith v. United States Congress*, No. 3:12CV45, 2012 WL 2416647, at *2–3 (E.D. Va. June 26, 2012). The Court concluded that Mr. Smith could only proceed on Claims 20 through 27. Hence, the Court dismissed Claims 1 through 19 and the claims following Claim 27.

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[3] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

[4] The Court quotes Mr. Smith's claims from his Complaint. The Court has omitted the emphasis in the quotations to the Complaint. The Court has corrected the capitalization and punctuation in the quotations from Mr. Smith's submissions.

Claim 21    Defendants Clarke, Jabe, Cei, Jones Express Music, Garman, Dillman, Faith Review Committee, Dabb, and Gray discriminated against Plaintiff by granting other prisoners the right to purchase and receive musical compact discs . . . and denying him an opportunity to purchase and receive compact discs of sermons by Minister Farrakhan at Green Rock Correctional Center from August 11, 2009, until January 21, 2010, in violation of the [(a)] Fourteenth Amendment[5] and [(b)] [RLUIPA].

(*Id.* at 4.)

Claim 22    Defendants Clarke, Jabe, Jones Express Music, Cei, Faith Review Committee, Dillman, Gray, Dabb, and Garman have withheld from Plaintiff five (5) books by the Most Honorable Elijah Muhammad and eight (8) cassette tapes by Minister Farrakhan from around June 27, 2009, until the present time in violation of the [(a)] First Amendment and [(b)] [RLUIPA].

(*Id.* at 5.)

Claim 23    Defendants Clarke, Jabe, Jones Express Music, Everett, Hinkle, Cei, Faith Review Committee, and Washington deprived Plaintiff of an opportunity to purchase and receive compact discs of sermons by Minister Farrakhan at Greensville Correctional Center from January 21, 2010, until April 30, 2010, in violation of the [(a)] First Amendment and [(b)] [RLUIPA].

(*Id.* at 7.)

Claim 24    Defendants Clarke, Jabe, Hinkle, Cei, Faith Review Committee, Jones Express Music, Everett, and Washington discriminated against Plaintiff by denying him an opportunity to purchase and receive compact discs of sermons by Minister Farrakhan and allowing other prisoners to purchase and receive musical compact discs from Jones Express Music at Greensville Correctional Center from January 21, 2010 until April 30, 2010 in violation of the [(a)] Fourteenth Amendment and [(b)] [RLUIPA].

(*Id.*)

Claim 25    Defendants Jones Express Music, Clarke, Cei, Faith Review Committee, Jabe, Washington, Hinkle, and Everett deprived Plaintiff of an opportunity to purchase and receive compact discs of sermons by Minister Farrakhan by implementing unconstitutional    memoranda    at

---

5 "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Greensville Correctional Center from April 30, 2010, until the present time, in violation of the [(a)] First Amendment and [(b)] [RLUIPA].

(*Id.* at 8.)

Claim 26    Defendants Clarke, Robinson, Cei, Faith Review Committee, Washington, Jabe, Everett, Hinkle, and Jones Express Music are discriminating against Plaintiff by denying him the right to purchase and receive sermons by Minister Farrakhan directly from The Final Call, Inc., while allowing other prisoners to purchase and receive newspapers, magazines, catalogs, pamphlets, etc., from ANY legitimate mail order source of the prisoners' own choosing in violation of the [(a)] Fourteenth Amendment and [(b)] [RLUIPA].

(*Id.* at 12.)

Claim 27    Defendants Clarke, Robinson, Cei, Faith Review Committee, Washington, Jabe, Everett, Hinkle, and Jones Express Music are discriminating against Plaintiff by authorizing prisoner Alonzo Muhammad (a.k.a. Alonzo X Hunter) #1027160, to purchase and receive compact discs of sermons by the Honorable Minister Farrakhan directly from The Final Call, Inc., while denying Plaintiff this same right, in violation of the [(a)] Fourteenth Amendment and [(b)] [RLUIPA].

(*Id.*)

Mr. Smith demands monetary damages and injunctive relief. Defendants[6] have moved for summary judgment. Mr. Smith has responded to Defendants' Motion for Summary Judgment and filed his own motions for partial summary judgment.

By Memorandum Order entered on October 27, 2014, the Court granted in part Defendants' Motion for Summary Judgment (ECF No. 53) and dismissed Mr. Smith's demands for monetary damages with respect to his RLUIPA claims. The Court further noted that the summary judgment record revealed that Defendants have ceased much of the conduct that gave rise to Mr. Smith's RLUIPA and Free Exercise claims. Accordingly, the Court directed Mr.

---

[6] By Memorandum Order entered on July 18, 2014, the Court dismissed all claims against Jones Express Music because Mr. Smith failed to serve that entity in a timely manner. (ECF No. 58, at 2.) The Court will refer to the remaining defendants simply as "Defendants."

Smith to submit any authority or evidence demonstrating that his claims, demanding declaratory and injunctive relief with respect to Defendants' past conduct, are not moot. Additionally, by Memorandum Order entered on October 27, 2014, the Court directed that Mr. Smith demonstrate why summary judgment should not be granted with respect to his Free Exercise and RLUIPA claims on the ground that he fails to demonstrate that Defendants imposed a substantial burden on his religious exercise. Mr. Smith responded to that order by submitting a number of affidavits and some grievance materials.

Finally, by Memorandum Order issued on February 11, 2015 (ECF No. 72), the Court directed Defendants to file affidavits or other admissible evidence regarding the current "arrangement with GraceInside, or some other entity, that allows offenders to donate money so that audio recordings can be purchased and maintained in the Chaplain's library at Greensville for offender use," and to provide specific information with respect to The Final Call. Mr. Smith was advised that, "within the same time period, he may submit a sworn statement setting forth his personal knowledge as to the [same] matters." (ECF No. 72, at 3-4.) Defendants filed a response and an affidavit from R. Myers, President of GraceInside. (ECF No. 75.) On February 24, 2015, Mr. Smith filed, *inter alia*, a Motion for Partial Summary Judgment (ECF No. 81), a Motion for Leave to File Accompanying Supplemental Memorandum in Support of Motion for Partial Summary Judgment (ECF No. 82), a Motion to Strike (ECF No. 86), and three more sworn statements (ECF Nos. 79, 80, 82-2).[7]

---

[7] Mr. Smith also filed a Motion for Sanctions wherein he requests sanctions against Defendants because prison officials failed to assist him in notarizing and transmitting his most recent series of sworn statements to this Court. As the Court has received the sworn statements and considers them in resolving Defendants' Motion for Summary Judgment, Mr. Smith has suffered no prejudice. Accordingly, the Motion for Sanctions (ECF No. 83) will be DENIED.

## I. Standard For Summary Judgment

Summary judgment shall be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the

court of the basis for the motion and to identify the parts of the record that demonstrate the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation

marks omitted). When the motion is properly supported, the nonmoving party must go beyond

the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

(quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences

in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835

(4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a

mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251

(citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1871)). "'[T]here is a

preliminary question for the judge, not whether there is literally no evidence, but whether there is

any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the

*onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does

not impose upon the district court a duty to sift through the record in search of evidence to

support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th

Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submitted affidavits from: A. David Robinson, Chief of Correctional Operations for the Virginia Department of Corrections ("VDOC") (Mem. Supp. Mot. Summ. J. Ex. 1, "Robinson Aff.," ECF No. 54-1); John Jabe, the former Deputy Director of the VDOC, (*id.* Ex. 2, "Jabe Aff.," ECF No. 54-2); Valerie Gray, the Institutional Operations Manager at Green Rock Correctional Center ("GRCC") (*id.* Ex. 3, "Gray Aff.," ECF No. 54-3); Louis B. Cei, the Operations Support Manager for the VDOC, Chairman of the Publications Review Committee ("PRC"), and Chairman of the Faith Review Committee (*id.* Ex. 4, "Cei Aff.," ECF No. 54-4); and, Paul Beighley, the institutional Chaplain at the Greensville Correctional Center (*id.* Ex. 5, "Beighley Aff.," ECF No. 54-5). Defendants also have submitted a number of VDOC memos. Additionally, in their Response to Court Order (ECF No. 70), Defendants submitted the affidavit Elisabeth M. Thornton, the Operations Manager for the VDOC ("Thornton Aff.," ECF No. 70-2). Finally, in response to the Court's Memorandum Order entered on February 11, 2015, Defendants submitted the affidavit of R. Myers, the President of GraceInside, Virginia's prison chaplain service. ("Myers Affidavit," ECF No. 75-1).[8]

In response to Defendants' Motion for Summary Judgment, Mr. Smith directs the Court to his Fourth Amended Complaint, to which he swore under oath.[9] In addition, Mr. Smith

---

[8] On March 4, 2015, the Court received from Mr. Smith a Motion to Take Judicial Notice wherein he states that as of February 25, 2015, he had not received Defendants' response to the February 11, 2015 Memorandum Order. Therefore, the Court will GRANT Mr. Smith's motion (ECF No. 88) to the extent that the Court will not consider the Myers Affidavit with respect to ruling on summary judgment.

[9] On February 24, 2015, the Court received from Mr. Smith a copy of the letter Mr. Smith sent counsel for Defendants requesting documents (ECF No. 80, at 5) and a Request for Admissions

submitted: an Affidavit in Response to Affidavit of Robinson ("Smith Aff. #1," ECF No. 57-1);

an Affidavit in Response to Affidavit of Jabe ("Smith Aff. #2," ECF No. 57-2); an Affidavit in

Response to Affidavit of Cei ("Smith Aff. #3," ECF No. 57-3); a declaration from Alonzo X

Hunter ("Hunter Decl.," ECF No. 57-1, at 7-8 (as paginated by the Court's CM/ECF docketing

system)); and, an affidavit from Willie X ("Willie X Aff.," ECF No. 57-4).[10]  Additionally, Mr.

Smith has submitted three more recent affidavits ("Smith Aff. #4," ECF No. 63; "Smith Aff. #5,"

ECF No. 68; "Smith Aff. #6," ECF No. 71).  Finally, on February 24, 2015, Mr. Smith submitted

three more affidavits ("Smith Aff. #7," ECF No. 79; "Smith Aff. #8," ECF No. 80; "Smith Aff.

#9," ECF No. 82-2).[11]

In light of the foregoing submissions and principles, the following facts are established

for purposes of the Motion for Summary Judgment.

## II.  Summary Of Pertinent Facts

### A.    Mr. Smith's Religious Beliefs

Mr. Smith is "a sincere Muslim and a sincere believer in the religion of Islam as taught

by the Most Honorable Elijah Muhammad, . . . under the leadership of the Honorable Minister

Louis Farrakhan, the National Representative of the Most Honorable Elijah Muhammad and the

Nation of Islam." (Compl. ¶ 1.) According to Mr. Smith, "his religious tenets [require that he]

---

(ECF No. 84).  Federal Rule of Civil Procedure 56(d) permits the Court to deny a motion for
summary judgment or order a continuance when the "nonmovant shows by affidavit or
declaration that, for specified reasons, it cannot present facts essential to justify its opposition."
Fed. R. Civ. P. 56(d).  Mr. Smith has not filed any such affidavit or declaration. *See Evans v.
Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) (emphasizing the necessity of
filing such a declaration or affidavit).  Accordingly, the Court will proceed to resolve the
outstanding Motion for Summary Judgment.

[10]  The Court also considers two affidavits Mr. Smith attached to his Brief in Support of Motion
for Partial Summary Judgment ("Smith Aug. 20, 2014 Aff. #1," ECF No. 61-1; "Smith Aug. 20,
2014 Aff. #2," ECF No. 61-2).

[11]  Mr. Smith also attached a number of exhibits to his affidavits.

possess and . . . carefully study sermons by Minister Farrakhan to acquire a proper knowledge and understanding of the religion of Islam as taught by Minister Farrakhan . . . ." (*Id.* ¶ 2.) "Minister Farrakhan has ordered his incarcerated followers, including Plaintiff, to possess and study audio recordings of his weekly sermons and to purchase them directly from The Final Call, Inc., or from some other vendor under his leadership." (*Id.* ¶ 4.)[12]

Mr. Smith states that he must "*continually* purchase, receive, and study Minister Farrakhan's *weekly* sermons . . . ." (Smith Aff. #6 ¶ 8.) Mr. Smith insists that "[w]ithout access to these *weekly* sermons, [he is] unable to conduct or participate in Nation of Islam Fruit of Islam training as mandated by Minister Farrakhan and by [his] religious tenets." (*Id.*) Mr. Smith notes that the lack of access to these recordings makes it difficult "to stay abreast of the evolution of Minister Farrakhan's teachings . . . . [and] teach and train [his] prison co-religionists. These are religious obligations of [his] as a student and follower of Minister Farrakhan." (*Id.*)

"Prior to August 11, 2009, the VDOC permitted [Mr. Smith] to purchase, receive, and possess compact discs and cassette tapes of Minister Farrakhan's weekly sermons." (Compl. ¶ 8.)

### B.  VDOC's August 11, 2009 Policy

Over time there have been several changes to the VDOC policy regarding CDs and DVDs. (*See* Robinson Aff. ¶¶ 5-6.) On August 11, 2009, Defendant Jabe issued "a Memorandum advising the Wardens and Superintendents that all non-music CDs would be prohibited for purchase or possession by offenders. This included, but was not limited to, books,

---

[12] Mr. Smith represents that "Minister Farrakhan's unique voice and his unique exegeses of the Holy Qur-an, the Holy Bible, and the Nation of Islam's teachings increase Plaintiff's faith in Allah (God) and the Minister and make Plaintiff actually feel God's divine presence." (Compl. ¶ 7.)

speeches, and educational and religious materials." (Jabe Aff. ¶ 4.) The Memorandum provided that:

> [i]nstitutional Chaplains could possess approved non-music CDs and DVDs in religious libraries to be reviewed by offenders under the direct supervision of the Chaplain or other staff. If the Chaplain did not have a particular CD or DVD, the offender could ask him to order a copy for the library.

(*Id.*)

Defendant Jabe explains that "[t]his change in policy was done after the Publication Review Committee expressed concern about reviewing the non-music CDs as well as written publications. The Publication Review Committee had a serious concern with the amount of time it would take to review the non-music CDs." (*Id.* ¶ 5.)[13]

By Memorandum dated November 2, 2009, Defendant Jabe stated that "offenders who already possessed non-music CDs, documented as approved personal property, would be allowed to have that specific CD grandfathered in, and it would not be considered contraband." (*Id.* ¶ 6.)

From January 30, 2009 until January 21, 2010, Mr. Smith was confined in Green Rock Correctional Center. (Smith Aff. #2 ¶ 5.) On two occasions, Mr. Smith asked to listen to a compact disc or view a DVD sermon by Minister Farrakhan. (*Id.* ¶ 7.) "On each occasion the Chaplain and his inmate clerks informed [Mr. Smith] that the Chaplain's Library did *not* possess such discs." (*Id.* ¶ 8.) On January 6, 2010, in response to Mr. Smith's complaints about his lack of access to Minister Farrakhan's CDs, Defendant Garman informed him that that the VDOC "*is* currently working on establishing a process with [the] Chaplain Service to allow offenders to access approved faith-based, non-music CDs." (Smith Aff. #2 Ex. A, at 1 (emphasis added).)

---

[13] "With written publications [the Publication Review Committee was] able to skim for inappropriate content, but with the non-music CDs [they had] to listen to the entire CD in order to verify that it contain[ed] no inappropriate content. Likewise, institutional mailrooms were unable to quickly identify content in a non-music CD." (Jabe Aff. ¶ 5.)

C.    **VDOC's April 30, 2010 Policy**

On April 30, 2010, Defendant Jabe issued another memorandum, stating that:

the VDOC would allow religious non-music CDs to be purchased and possessed by offenders under certain conditions:  CDs were to come from the VDOC's approved vendor which, at that time, was Jones Music Express ("JEM"); they were to be pre-approved by the Faith Review Committee; and no longer than an hour in length.  The memorandum also indicated that the pre-approved list would be updated periodically based on recommendations from the Faith Review Committee.

(Jabe Aff. ¶ 7.)

D.    **VDOC's Current Policy**

Under the current policy:

All CDs - music and non-music - may be ordered from the VDOC contract vendor only.  If an offender wants a CD that is not listed in the vendor's catalog, then he must write a letter to the vendor to request a price quote.  If the vendor is unable to locate the requested CD, the order is not filled.  If the CD is listed as disapproved by the Publication Review Committee, it is denied. Nevertheless, there are alternatives to ordering CDs.  For example, if the requested CD is a spoken word CD, then the offender can purchase the information in book or other print form.

(Cei Aff. ¶ 6)

The VDOC also provided the following option if the designated vendor cannot supply the

religious non-music CD:

[O]ffenders would be permitted to request religious non-music CDs through their institutional Chaplain or some other designated staff person at their facility, if [the VDOC's designated CD vendor] was unable to provide that particular CD.  The CDs were subject to review by designated staff since they were being supplied by a different vendor. . . . Offenders who obtained religious non-music CDs in this fashion were not permitted to keep the CD in their possession.  They were kept in the Chaplain's library or facility library and made available to all offenders for review.

(Jabe Aff. ¶ 8.)

There is a 12-CD limit per offender. . . . Materials communicated in a language other than English or Spanish cannot be readily translated and reviewed for content.  This presents security concerns. Therefore, offenders may not possess materials written or communicated in code or in a language other than English or Spanish unless obtained from the approved vendor.  *However,*

10

> *offenders are allowed to order and possess specified foreign language religious texts approved by the FRC* [Faith Review Committee].

(Cei Aff. ¶ 7 (emphasis added).)

### E.   VDOC's Concerns Regarding CDs

Defendant Robinson provides the following explanation with regard to the VDOC's concerns with respect to CDs:

> CDs present special challenges to the VDOC because the content can be altered or supplemented without the changes being readily observable (short of listening to the entire disc). Therefore, a physical search of the CD is not sufficient to answer all security concerns. By using a single vendor, the VDOC decreases the chances of contraband entering the prisons and CDs being pirated or tampered with, for example, discs being switched or information being recorded over the existing content. By using one vendor, the VDOC is only required to approve a particular CD once and then it is added to the approved list for purchase for any offender to order. Also, a single vendor makes the process more uniform and standardized which in turn is easier to monitor for security purposes.

(Robinson Aff. ¶ 7.)

Defendant Robinson further notes this policy has successfully foiled the introduction of contraband into the VDOC. (*Id.*) Specifically, in one instance, "someone attempted to smuggle contraband in through packaging made to look like that of the vendor we contracted prior to [Music by Mail ("MBM")], but because of the familiarity with the particular vendor's packaging, VDOC staff was able to intercept the shipment." (*Id.*) Furthermore, "MBM is under a contractual obligation to assure that the proper CDs are being provided and that contraband is not coming into the facilities." (*Id.*) Thus, "[i]f the VDOC were to discover that MBM was providing CDs that are improperly labeled or have been tampered with, VDOC could cancel the contract, thus causing MBM to lose thousands of dollars a year in sales." (*Id.*)

### F.   Mr. Smith's Current Access to Minister Farrakhan's Sermons

The Faith Review Committee "has approved twenty (20) CDs of sermons by Minister Louis Farrakhan. Unfortunately, MBM has not been able to work out an arrangement with Final

Call publications which would allow Minister Farrakhan's sermons to be sold through MBM."
(Cei Aff. ¶ 8.) This impasse results from Minister Farrakhan's insistence that "his incarcerated
followers . . . purchase [his weekly sermons] directly from The Final Call, Inc., or from some
other vendor under his leadership." (Compl. ¶ 4.)

Although Mr. Smith cannot purchase CDs of Minister Farrakhan directly from The Final
Call,[14] he can review approved sermons purchased through his institutional chaplain. (Cei Aff.
¶ 8.) Defendant Beighley swears that the Chaplain Services has "Minister Farrakhan's sermons
available on CD.[[15]] The offenders may come to the chaplain's library to listen, or check out a
CD and take it to their cells. A cassette tape player is also maintained in the chaplain's library
and offenders may use it if they choose to listen to Minister Farrakhan's sermons on cassette
tapes." (Beighley Aff. ¶ 5.) Defendant Beighley swears that the "Chaplain Services maintains
more than forty (40) DVDs of Minister Farrakhan's sermons for review by the offenders.
Offender Smith may submit a request to view these in the chaplain's library, and in fact has done
so." (Id.) Mr. Smith acknowledges the availability of these DVDs, but complains that they are
old and he is not allowed to personally possess them. (Smith Aff. #2 ¶ 15.)

---

[14] On June 7, 2013, Mr. Smith submitted an Offender Request, wherein he sought an exception
from Defendants' policy. Specifically, Mr. Smith "request[ed] a religious exception to utilize *my
funds* to purchase, receive, and *possess* compact discs of sermons by Minister Farrakhan from
The Final Call, Inc. through the Chaplain or some other designated staff . . . ." (Smith Aff. #2
Ex. B, at 2 (emphasis added).) Apparently, because the Final Call was not an authorized vendor
for CDs, prison staff informed Mr. Smith, "You are not authorized to order these CDs." (*Id.*
(capitalization corrected).)

[15] Mr. Smith contends that prior to June 6, 2013, the "Chaplain's Library at [the Greensville
Correctional Center] did not have available for my use compact discs of Minister Farrakhan's
weekly sermon." (Smith Aff. #2 ¶ 13.) As of October 2013, there were seven (7) CDs
containing Minister Farrakhan's sermons in the Chaplain's Library. (Willie X Aff. ¶ 21.) "Each
is more than one (1) hour in length." (*Id.*) Mr. Smith acknowledges his access to these sermons,
but states that they were not Minister Farrakhan's "weekly sermons." (Smith Aug. 20, 2014 Aff.
#2 ¶ 4.)

Mr. Smith has submitted evidence that verifies that Nation of Islam inmates were formerly able to purchase sermons of Minister Farrakhan through the Greensville Chaplain directly from The Final Call. (*See* Smith Aug. 20, 2014 Aff. #2 ¶ 4; Willie X Aff. ¶¶ 11-19.) Willie X explains that:

> to gain access to Minister Farrakhan's sermons on compact discs and or digital video discs, each [Nation of Islam] Study Group is officially required to donate its personal funds to the Chaplain's Discretionary Funds at [Greensville]. The Student Minister authorizes Chaplain Beighley, who is one [of] three (3) Chaplains at [Greensville], to utilize this money to purchase these items "for the Chaplain's Library" at [Greensville] directly from The Final Call, Inc.
> 
> . . . .
> 
> When the compact discs, the digital video discs, or books arrive at [Greensville] directly from The Final Call, Inc., Chaplain Beighley picks-up these items, does all the required security checks and searches for contraband, for inappropriate content, for pirated or tampered with discs, then he stamps "Chapel Property" onto these items, and hand delivers them to me for placement in the Chaplain's Library.
> 
> Immediately thereafter, we may borrow these items from the Chaplain's Library and use them without being supervised for the security reasons falsely suggested by Defendants' responsive pleading.
> 
> We can take the compact discs back to our cells and listen to them in our cells, outside on the recreation yard, and or in our dayroom areas immediately after they have been given to me.

(Willie X Aff. ¶¶ 11, 14-16 (paragraph numbers omitted) (emphasis omitted).)

Although not an approved vendor for CDs, The Final Call is a VDOC approved vendor for newspapers, books, and magazines. (Smith Aff. #2 ¶ 20.) Mr. Smith acknowledges that "[T]he Final Call newspaper does carry *edited* portions of Minister Farrakhan's sermons." (Smith Aff. #8 ¶ 9.) Mr. Smith further notes that the sermons in the newspaper "are normally taken from very old sermons" and "are insufficient and inadequate for Fruit of Islam training and self-improvement." (*Id.*)

### G.   Recent Developments

"Chaplain Services, now GraceInside, is the non-profit organization that handled the Chaplain Discretionary Fund. The Chaplain Discretionary Fund was audited and informed that they needed to cease accepting funds from offenders as there was a conflict of interest and liability issues concerning offenders' donations to the fund." (Thornton Aff. ¶ 5). Although the "VDOC's current policy concerning offenders being allowed to donate to the Chaplain Discretionary Fund has not changed[,]" (*id.* ¶ 4), per the directions of GraceInside, "offender donations to the Chaplain's Discretionary Fund would be suspended effective February 28, 2014 and . . . until further notice, offenders would no longer be allowed to donate funds to this source." (*Id.*)[16]

Mr. Smith insists that, even if the VDOC and GraceInside worked out an arrangement that would allow him to purchase Minister Farrakhan's sermons through GraceInside, he would not utilize it. (Smith Aff. #8 ¶¶ 6, 7.) Mr. Smith represents that "I would clearly violate [my religious beliefs] if I were to consent to the use of my money by GraceInside or its affiliates to make these recordings available to me . . . ." (*Id.* ¶ 7.) Mr. Smith elaborates that "[s]ending my money [to] GraceInside or its affiliates would be the equivalent of serving their *FALSE* God and his FALSE religion . . . ." (*Id.* ¶ 11.)

### H.   Mr. Smith's May 10, 2009 Order of Tapes and Books

On May 10, 2009, Mr. Smith submitted a request to purchase "eight (8) religious cassette tapes by the Honorable Louis Farrakhan and five (5) religious books by the Honorable Elijah Muhammad." (Smith Aff. #3 ¶ 2.) "On May 27, 2009, Property Control Officer approved said

---

[16] Defendants represent that the VDOC "is exploring an alternative arrangement, acceptable to GraceInside[,] that will permit the offender to donate money to some entity so that audio recordings can be purchased and maintained in the Chaplain's library at Greensville for offender use." (Resp. Court Order 3 (citing Thornton Aff. ¶ 6).)

request and forwarded it to the Accounting Department at Green Rock Correctional Center . . . for final processing and mailing . . . ." (*Id.* ¶ 4.)[17] "On May 28, 2009, the Accounting Department deducted $43.00 from [Mr. Smith's account] and mailed the money . . . to The Final Call, Inc., . . . ." (*Id.* ¶ 5 (citation omitted).) On June 1 and 3, 2009, prison officials informed Mr. Smith that he would receive his books, but the cassette tapes would have to be ordered through Music by Mail, instead of directly from The Final Call. (*Id.* Ex. B at 1; *Id.* Ex. C at 1.) Nevertheless, when the tapes and books arrived at Green Rock Correctional Center, they were sent to the Publications Review Committee or the Faith Review Committee in Richmond, Virginia. (Smith Aff. #3 ¶¶ 12–16.)

The Publications Review Committee retained the tapes and books for the next couple of years because they asserted that Mr. Smith failed to provide proper proof of ownership or payment. (Smith Aff. #3 Ex. E at 1–4.) By letter dated June 19, 2013, Defendant Cei informed Mr. Smith that Cei "decided to send them to Chaplain Paul Beighley at Greensville Correctional Center so that [Mr. Smith] and other Nation of Islam offenders can have access to them" because Mr. Smith could not prove his ownership of the cassette tapes. (ECF No. 54-4, at 13 (as paginated by CM/ECF.) Defendant Cei further informed Mr. Smith that he remained free to provide Chaplain Beighley with any proof of his ownership of the cassettes. (*Id.*)[18]

Defendant Cei swears that: "Although Smith alleges that there were eight cassette tapes, my records reflect only five tapes. Also, I am unaware of any books received from Smith. If in

---

[17] The authorization to order property, however, is not an authorization to possess or own that property. (Gray Aff. ¶ 4.) Offenders can "place orders for personal property, but when the item [is] in the institution's mailroom, review/search [is] conducted to determine if the property [is] in compliance with security guidelines." (*Id.*)

[18] Mr. Smith swears that he "know[s] absolutely nothing about [the] cassette tapes" that Defendant Cei references, because they "did *not* come from me." (Smith Aff. #3 ¶ 22.)

fact there were books of Smith's forwarded to the [Faith Review Committee] or [the Publication Review Committee], I have no knowledge as to their disposition." (Cei. Aff. ¶ 4.)

### III. Analysis

**A.    Mr. Smith's Claims for Declaratory and Injunctive Relief with Respect to the Past Practices of the VDOC**

In Claims 20, 21, 23, and 24, Mr. Smith seeks declaratory and injunctive relief with respect to the past practices of the VDOC. "Because the requirement of a continuing case or controversy stems from the Constitution, it may not be ignored for convenience's sake." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (citing *United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920)). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)). In this regard, "'[t]he requisite personal interest that must exist at the commencement of the litigation . . . must continue throughout its existence.'" *Id.* (omission in original) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n. 22 (1997)). Because Mr. Smith is no longer subject to the policies challenged in Claims 20, 21, 23, and 24, his demands for injunctive relief with respect to those claims are conceivably moot. *See Church of Scientology of Cal.*, 253 U.S. at 12 (citations omitted); *DeMoss v. Crain*, 636 F.3d 145, 150–51 (5th Cir. 2011) (holding that when prison system discontinued the policy of preventing general-population prisoners on cell restriction from attending religious services, plaintiff's complaint concerning this policy was moot); *Incumaa*, 507 F.3d at 287 ("'As applied' does not mean 'as it used to apply,' but rather 'as it continues to apply.'").

However, the Fourth Circuit has held that "a defendant's voluntary cessation of a challenged practice moots an action only if subsequent events made it absolutely clear that the

allegedly wrongful behavior could not reasonably be expected to recur." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (internal quotation marks omitted) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). The party asserting mootness has a "heavy burden of persua[ding] the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted). Generally, "when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot." *Id.* at 497 (citing *Town of Nags Head v. Toloczko*, 728 F.3d 391, 395 n. 3 (4th Cir. 2013); *Pashby v. Delia*, 709 F.3d 307, 316 (4th Cir. 2013); *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001). In the face of controlling Fourth Circuit precedent—previously applied in a case analogous to the instant case—the Court must determine whether it is "absolutely clear" that the policies challenged in Claims 20, 21, 23, and 24 will not be reinstated.

As previously described herein, in 2009, the VDOC adopted a policy ("2009 Policy") with regard to offenders' ability to obtain and possess non-musical CDs in response to security concerns. (Jabe Aff. ¶ 4.) The policy allowed offenders to obtain musical CDs, but required offenders to request non-musical CDs through the Chaplain. (*Id.*) Offenders also could not keep these non-music CDs in their possession except for non-music CDs that they already possessed as "approved personal property." (*Id.* ¶ 6.) On April 30, 2010, the policy was amended, and offenders could request non-music CDs from the VDOC's approved vendor based on a pre-approved list, approved by the Faith Review Committee. (*Id.* ¶ 7.) In 2011, the VDOC again amended its policy to the current policy, which allows offenders to order CDs directly from the VDOC's approved vendor. (Cei Aff. ¶ 6.) The vendor will attempt to obtain a copy of the CD as long as the CD is not disapproved by the Publication Review Committee and, if the vendor is unsuccessful, the offender can request that the Chaplain obtain a copy. (*Id.*; Jabe Aff. ¶ 8.)

Claims 20, 21, 23, and 24 challenge the 2009 Policy, which was in effect from August 11, 2009 until it was changed on April 30, 2010.

In *Wall*, the Fourth Circuit addressed the potential mootness of challenges to previous prison policies, no longer in effect. The challenged policy required offenders to prove the sincerity of their religious beliefs by providing "some physical indicia of Islamic faith, such as a Quran, Kufi, prayer rug, or written religious material obtained from the prison Chaplain's office" in order to participate in Ramadan. *Wall*, 741 F.3d at 494. The plaintiff could not prove possession of such an object, and thus was not permitted to participate in Ramadan. *Id.* at 495. In the following year, the VDOC changed this policy to allow offenders to show sincerity of belief by showing that they had in the past borrowed religious materials from the Chaplain. *Id.* at 496. This new policy very closely mirrored the old policy.

In *Wall*, the Fourth Circuit concluded that the defendants did not meet their "heavy burden" of establishing that it is "absolutely clear" that the old Ramadan policy will not be reinstated. *See id.* at 497. Furthermore, the Court of Appeals noted that the fact that the VDOC instituted three policies since 2009 "indicate[d] some degree of doubt that the new policy [would] remain in place for long." *Id.* Moreover, in *Wall*, by raising the issue of mootness, the defendants avoided any review under RLUIPA of their continuing "arbitrary [and] irrational" *id.* at 500 (internal quotation marks omitted) (citation omitted), practice of utilizing an inmate's possession of a religious items as a litmus test for the sincerity of his or her religious beliefs. *See Wall v. Wade*, No. 7:11-cv-00191, 2012 WL 5990112, at *1-5 (W.D. Va. Nov. 30, 2012).

The Court finds that the facts of the instant case are largely distinguishable from those of *Wall*. In *Wall*, the VDOC changed its Ramadan policy several times; however, each iteration continued "the practice of requiring physical indicia of faith" as a prerequisite to participation in Ramadan. *Wall*, 741 F.3d at 497. In the instant case, the VDOC's policies have not forced

18

offenders to first demonstrate the sincerity of their religious beliefs before being permitted to undertake a religious practice. Here, neither the 2009 Policy nor the present policy categorically prohibits offenders from accessing religious materials or from undertaking a religious practice.

Unlike the policies at issue in *Wall*, the 2009 Policy did not require offenders to prove the sincerity of their religious beliefs. The 2009 Policy merely restricted the ability of offenders to purchase and possess new religious CDs. Furthermore, unlike the policies at issue in *Wall*, the VDOC is clearly modifying its CD policy to allow offenders greater access to religious CDs, while still addressing security concerns. This modification is distinguishable from the modification of the *Wall* policies, because the *Wall* policies all still had the underlying problem of requiring offenders to prove the sincerity of their religious beliefs with physical indicia of their faith before they could participate at all in Ramadan.

Moreover, unlike in *Wall*, the VDOC's policy changes demonstrate a desire to allow prisoners as great an access to religious materials as possible, while still addressing legitimate penological and security concerns. In the almost five years since the VDOC modified the 2009 Policy, nothing in the record suggests an intent or inclination by the VDOC to return to that more restrictive policy. Furthermore, unlike in *Wall*, a finding of mootness fails to foreclose review of Defendants' current policies that Mr. Smith contends violate his rights under RLUIPA.

"While it is well established that the voluntary discontinuance of challenged activities by a defendant does not necessarily moot a lawsuit," *United States v. Jones*, 136 F.3d 342, 348 (4th Cir. 1998) (citing *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 71–72 (1983)), dismissal remains appropriate if "there is no reasonable likelihood that that the wrong will be repeated." *Id.* (internal quotation marks omitted) (citations omitted).[19] The record contains no evidence

---

[19] In *Jones*, the Fourth Circuit vacated the district court's injunctions with respect to The Citadel's male-only admission policy. *Jones*, 136 F.3d at 348–49. The Fourth Circuit observed,

demonstrating a reasonable likelihood that the VDOC intends to reinstate the more restrictive CD policies that existed prior to April 30, 2010. *See id.* (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)); *see also Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (observing that substantial amendment of challenged regulation mooted controversy over its validity); *see DeMoss*, 636 F.3d at 150–51 (holding that when prison system discontinued the policy of preventing general-population prisoners on cell restriction from attending religious services, plaintiff's complaint concerning this policy was moot); *Miles v. Moore*, No. 3:10cv162, 2012 WL 4866561, at *4 n.11 (E.D. Va. Oct. 12, 2012) (concluding inmate's challenge to prior policy was moot when "no evidence" existed that defendants intended to reinstate the prior policy). Mr. Smith would not benefit from any injunction or declaration that such policies violated RLUIPA or the Constitution. *Incumaa*, 507 F.3d at 287 ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed.'" (quoting *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983))). Accordingly, Mr. Smith's claims for injunctive and declaratory relief with respect to Claims 20, 21, 23, and 24 will be DISMISSED AS MOOT. As the Court already has dismissed Mr. Smith's demands for monetary damages with respect to his RLUIPA claims, this dismissal also results in the DISMISSAL of Claims 20(b), 21(b), 23(b) and 24(b).

**B.    RLUIPA**

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
>     (1) is in furtherance of a compelling governmental interest; and
>     (2) is the least restrictive means of furthering that compelling governmental interest.

"Nothing in the record indicates that The Citadel had any intention of returning to a male-only admissions policy. Indeed, all of the evidence points the other way." *Id.* at 348.

20

42 U.S.C. § 2000cc–1(a). Thus, to begin, Mr. Smith must demonstrate that Defendants' policies

impose a "substantial burden" on his religious exercise. In determining if Mr. Smith has met this

standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,'

and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004);

*see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

### 1.   Whether the Burdened Activities Are a Religious Exercise

The Court assumes that the religious activities in question constitute a religious exercise.

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion,

whether or not compelled by, or central to, a system of religious belief.'" *Couch*, 679 F.3d at

200 (quoting 42 U.S.C. § 2000cc–5(7)(A)). Mr. Smith contends that the VDOC's current policy

substantially burdens his religious exercise because:  (1) it prevents him from possessing and

studying Minister Farrakhan's sermons and "it effectively prevents [Mr. Smith] from receiving

and possessing compact discs of sermons by Minister Farrakhan donated by a Mosque or a

legitimate vendor owned and operated by the Nation of Islam" (Compl. ¶ 28(F)); (2) "it

effectively prevents [him] from financially supporting the Nation of Islam as required by his

religious tenets and beliefs" which require that he purchase the CDs directly from The Final Call

(*id.* ¶ 28(A)); and, (3) "it effectively prevents [Mr. Smith] from studying and learning to read

Qur-anic Arabic and to make prayer in Arabic as mandated by his religious tenets and beliefs"

(*id.* ¶ 28(D)).  Given RLUIPA's broad definition of religious exercise, the Court assumes these

activities constitute religious exercise. *See Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA),

2011 WL 5843622, at *3 (E.D. Va. Nov. 18, 2011) (assuming inmate's enrollment in seminary

course constituted religious exercise for purposes of RLUIPA).

21

### 2.   Whether Mr. Smith Demonstrates a Substantial Burden on His Religious Exercise

Mr. Smith fails to demonstrate a substantial burden on his religious exercise. RLUIPA does not to define the term substantial burden. *See Couch*, 679 F.3d at 200. The United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[20] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her

---

[20] In *Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that the VDOC's grooming policy and enforcement mechanism, "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the denial of additional sacred items simply by the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that

23

plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the "Blot" ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)).

Furthermore, the plaintiff must demonstrate that a government practice, rather than some other consideration not attributable to the government, imposes the substantial burden on his or her religious exercise. *See Adkins*, 393 F.3d at 571. For example, in *Adkins*, the prison system required that an accredited outside volunteer be present to lead any congregation meeting. *Id.* at 563. Adkins, a member of the Yahweh Evangelical Assembly ("YEA") asserted that "he has not been permitted to observe particular days of rest and worship (each Saturday for the Sabbath and a number of specific holy days), which is a requirement of his faith." *Id.* at 562. Although "the evidence show[ed] that Adkins was and is prevented from congregating with other YEA members on many Sabbath and YEA holy days," the United States Court of Appeals for the Fifth Circuit rejected the assertion that this burden was attributable to the prison system. *Id.* at 571. The Fifth Circuit observed that Adkins' inability to congregate on certain days "results . . . from a dearth of qualified outside volunteers available to go to [his prison] on every one of those days, not from some rule or regulation that directly prohibits such gatherings." *Id.*; *see Walls v.*

24

*Schriro*, No. CV 05–2259–PHX–NVW (JCG), 2008 WL 544822, at *12-13 (D. Ariz. Feb. 26, 2008) (concluding no RLUIPA violation and no substantial burden on inmate's religious practice where inmate's housing unit lacked sufficient number of members of his faith group and available volunteers to allow inmate to engage in religious services, and prison declined to transfer inmates to obtain quorum where volunteers were available). As explained below, in light of the foregoing principles, for Claims 22(b), 25(b), 26(b), and 27(b), Mr. Smith fails to demonstrate any substantial burden upon his religious exercise.

### (a) Studying Minister Farrakhan's Sermons

At the outset, it is appropriate to note that no rule or regulation directly prohibits Mr. Smith from possessing or obtaining CDs of Minister Farrakhan's sermons. *See Adkins*, 393 F.3d at 571. The record reflects that the VDOC has approved many of Minister Farrakhan's sermons. (Cei Aff. ¶ 8.) The burden on Mr. Smith's ability to obtain CDs of Minister Farrakhan's sermons flows most directly from Minister Farrakhan and The Final Call's refusal to permit the VDOC's approved CD vendor to distribute them. *Id.* Thus, Mr. Smith fails to demonstrate that Defendants substantially burdened his religious exercise related to Minister Farrakhan's weekly sermons.[21]

Moreover, Mr. Smith "fails to demonstrate a substantial burden on his religious exercise simply because Defendants' single vendor policy hampers one method for him to study the sermons of . . . Minister Farrakhan." *Shabazz*, 2013 WL 1098102, at *8 (rejecting nearly identical claim). The record reflects that, through the Chaplain's Library, Mr. Smith has access

---

[21] Permitting Mr. Smith and other Nation of Islam inmates an exemption from the single-vendor policy so that they could purchase CDs directly from The Final Call also raises serious Establishment Clause concerns. *See Corporation of Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 334–35(1987) (internal quotation marks omitted) (citation omitted) (observing that "accommodation may devolve into an unlawful fostering of religion").

to scores of sermons of Minister Farrakhan on DVDs, CDs, and cassette tapes. Additionally, Mr.

Smith and the other Nation of Islam inmates at Greensville Correctional Center retain possession

of all recordings containing sermons of Minister Farrakhan that they possessed prior to the

VDOC's 2009 restrictions on recordings.[22] Although Mr. Smith complains about the age of

some of these recordings, no evidence exists that Mr. Smith has exhausted the religious

significance of studying these recordings.

With respect to the current teachings of Minister Farrakhan, Mr. Smith remains free to

purchase other publications from The Final Call, Inc., including The Final Call newspaper,

described on The Final Call website as "the official communications organ of the Nation of

Islam,"[23] which includes portions of sermons from Minister Farrakhan. *See Shabazz*, 2013 WL

1098102, at *8 n.18.[24] Additionally, The Final Call website lists a variety of books that contain

---

[22] Mr. Smith also contends that religious tenets require that he "possess" the sermons of Minister Farrakhan. Mr. Smith obviously has physical possession of any CD or DVD he owns or checks out from the Chaplain Library. Furthermore, Mr. Smith fails to adequately articulate the religious significance of the mere possession of the CD of a sermon such that the lack of constant possession of the same could constitute a substantial burden on his religious exercise. *See Krieger*, 496 F. App'x at 326 (concluding inmate's "blanket assertion" "that the sacred items were 'necessary' to perform 'well-established rituals'" was insufficient to establish a substantial burden when inmate failed to "identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs"); *see also DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue" (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006))); *Marron v. Jabe*, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n.5 (E.D. Va. Feb. 14, 2014) (citations omitted).

[23] http://www.finalcall.com/artman/publish/aboutus/aboutus.shtml (last visited Mar. 4, 2015).

[24] In *Shabazz*, a case in which Mr. Smith was an active participant, Shabazz acknowledged that prison officials allowed him "to purchase publications [and] subscriptions to The Final Call newspaper, which carr[ies] a portion of [Minister Farrakhan's] sermons in every issue . . . ." *Shabazz*, 2013 WL 1098102, at *5 (citation omitted); *S.E.C. v. Carnicle*, No. 99-4233, 2000 WL 796090, at *1 (10th Cir. 2000) (observing "that it is proper for court to consider records of other related proceedings in granting summary judgment" (citing *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979))).

the teachings of Minister Farrakhan.[25]   *See Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510

F. App'x 223, 227 (4th Cir. 2013) (observing that "'it is not uncommon for courts to take judicial

notice of factual information found on the world wide web'" (quoting *O'Toole v. Northrop*

*Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007))).  Although Mr. Smith complains about

the age and edited nature of the sermons available in The Final Call newspaper, he fails to

demonstrate that they lack religious value or significance.  Certainly, no evidence exists to

assume that these regularly published sermons are selected and edited with an eye to frustrate,

rather than further, the spiritual growth of the members of the Nation of Islam.

      This is not a case where the actions of prison officials have completely prevented an

inmate from participating in a religious ritual or practicing a tenet of his or her faith.  *See*

*Lovelace*, 472 F.3d at 187-88 (concluding policy that prevented Muslim inmate from

participating in Ramadan imposed a substantial burden); *Couch*, 679 F.3d at 200-01 (finding

policy that precluded prisoner from maintaining a beard, as required by his faith, imposed a

substantial burden).  Rather, Defendants' current policies limit one method for Mr. Smith to

study the teachings of Minister Farrakhan, while allowing Mr. Smith ample, if not unlimited,

opportunities to engage in that religious practice.  *See Krieger*, 496 F. App'x at 326; *see also Van*

*Wyhe v. Reisch*, 581 F.3d 639, 656-57 (8th Cir. 2009) (concluding that an inmate failed to

demonstrate that the denial of additional group study time imposed a substantial burden upon his

religious exercise where prison officials already provided three hours of group study and worship

time and allowed inmate to study in his cell); *Coleman*, 413 F. App'x at 876 (holding that prison

policies that limited the inmates' access to religious radio and television broadcasts failed to

---

[25] http://store.finalcall.com/searchresults.asp?cat=5 (last visited Mar. 6, 2015).  The Final Call
Online Store offers more than fifty books in hardcopy format.  While portions of Minister
Farrakhan's sermons are included in The Final Call newspaper, (Smith Aff. #8 ¶ 9), it does not
appear that the Nation of Islam makes the full text of the sermons available in print form through
The Final Call Online Store or any other known source.

substantially burden the inmates' religious exercise because the inmates "may receive religious

literature via the mail and may receive visitors at the prison to discuss their religious beliefs");

*see also Jones v. Shabazz*, 352 F. App'x 910, 914 (5th Cir. 2009) (concluding that Nation of

Islam inmate failed to demonstrate that prison officials substantially burdened his religious

exercise by denying him access to videotaped religious lectures by Minister Farrakhan). [26]

  Although Defendants' policies may make it "more expensive or difficult" for Mr. Smith

to study Minister Farrakhan's sermons and teachings, the record reveals a variety of methods for

Mr. Smith to engage in that religious practice. *Living Water Church of God*, 258 F. App'x at

739. Specifically, Mr. Smith can: (1) retain possession of and continue to study the recordings of

Minister Farrakhan that he possessed prior to the adoption of the 2009 Policy; (2) access audio

and visual recordings of Minister Farrakhan's sermons currently available in the Chaplain's

library; and (3) purchase publications from The Final Call, Inc., including books and The Final

Call newspaper. In short, the VDOC is not prohibiting Mr. Smith from studying the sermons and

teachings of Minister Farrakhan or categorically preventing him from practicing that tenet of his

---

[26] Many of Mr. Smith's statements are similar to the plaintiff's in *Jones*, where the plaintiff submitted

> an affidavit in which he state[d] in part: "It is mandatory that all NOI [Nation of Islam] adherents study DVD/videotape lectures of Minister Farrakhan during Islamic services (i.e., Judah and Taleem)." In another affidavit, Plaintiff states, "It is mandatory that all NOI adherents study the following NOI religious material at *all* Islamic services: (A) *All* books written by .... Elijah Muhammad, (B) *All* books written by .... Minister Louis Farrakhan, (C) *All* books written by other NOI officials; (D) DVD/videotape lectures of Minister Farrakhan ...."

*Jones v. Shabazz*, No. H-06-1119, 2007 WL 2873042, at *11 n.9 (S.D. Tex. Sept. 28, 2007) (citations omitted). The Fifth Circuit noted that the plaintiff failed to demonstrate a substantial burden because he only produced "a self-serving affidavit claiming he regards viewing the videotapes as a mandatory part of his NOI faith." *Jones*, 352 F. App'x at 914.

faith.[27] In light of the foregoing circumstances, Mr. Smith fails to demonstrate that his ability to study the sermons and teachings of Minister Farrakhan has been *substantially burdened.*

Mr. Smith also complains that the current policy prevents him from accessing CDs donated by Mosques or a vendor operated by the Nation of Islam. Once again, Mr. Smith fails to adequately articulate any particular religious significance of accessing donated CDs, such that a reasonable trier of fact could conclude that his religious exercise has been substantially burdened. *See Krieger*, 496 F. App'x at 326; *Marron*, 2014 WL 585850, at *5 n.5; *see also DeSimone*, 355 F. App'x at 46 (citation omitted). Accordingly, Mr. Smith's RLUIPA claims with respect to the above-described practices fail to survive summary judgment.

### (b) Financially Supporting The Final Call and the Nation of Islam

No evidence exists that Defendants preclude Mr. Smith from sending money directly to the Nation of Islam. Furthermore, Mr. Smith is capable of financially supporting The Final Call and the Nation of Islam by purchasing books and other written material from The Final Call. *Cf. Van Wyhe*, 581 F.3d at 656-57 (concluding inmate failed to establish a substantial burden on his religious exercise by prison officials' refusal to provide additional group study time beyond the three hours already allotted). While Defendants' single vendor policy for CDs may make it somewhat more expensive for Mr. Smith to support the Nation of Islam, the current policy fails to substantially pressure Mr. Smith to violate or abandon one of the precepts of his religion. *Living Water Church of God*, 258 F. App'x at 739; *Shabazz*, 2013 WL 1098102, at *8–9 (rejecting similar claim). Thus, Mr. Smith fails to demonstrate a substantial burden on his

---

[27] Mr. Smith cannot demonstrate a substantial burden simply because the sermons he can review are not the most recent weekly sermons or are abridged. *See Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) (noting the insufficiency of a plaintiff's "unreasoned say-so" to create a triable issue with respect to the substantial burden inquiry).

religious exercise, and his RLUIPA claims with respect to financially supporting the Nation of Islam will be DISMISSED.

### (c) Learning to read Qur-anic Arabic and pray in Arabic

Mr. Smith insists that the current policy that precludes most foreign language CDs prevents him from learning to read and pray in Arabic. The record indicates that Defendants currently do not allow Mr. Smith to purchase CDs in Arabic. (Jabe Aff. Encl. D, at 2.) The record, however, reveals that Defendants provide Mr. Smith with the opportunity to order non-English written material that would allow him to learn to read and pray in Arabic. Specifically, the pertinent regulations state:

> The restriction on foreign language publications does not apply to publications that contain complete, direct translations from a foreign language into English (i.e. English – foreign language dictionaries, language text books and publications that contain parallel text in English and other languages).
> Offenders may order and possess specified foreign language religious texts from vendors approved by the Faith Review Committee as a source of foreign language religious texts.

(Cei Aff. Encl. A § 803.2.IV.M.5 & 6 (paragraph numbers omitted) (citation omitted).) Mr. Smith fails to demonstrate why he cannot utilize written material to learn Arabic. Thus, the current policy fails to significantly pressure Mr. Smith to abandon his religious obligation to study Arabic. *See Van Wyhe*, 581 F.3d at 657 ("RLUIPA does not require the prison to permit an inmate to possess [or obtain] every tangential item of property that could aid the inmate's religious exercise or learning."). At best, the record indicates that the restrictions on Arabic CDs amount to a mere "inconvenience" in his ability to learn Arabic. *Smith*, 502 F.3d at 1278 (citing *Midrash Sephardi, Inc.*, 366 F.3d at 1227); *Coleman*, 413 F. App'x at 876. Given the available material for learning Arabic, Mr. Smith fails "to create a question of fact regarding how the absence of [Arabic language CDs] forces him to modify or to violate his religious beliefs." *LeBaron v. Spencer*, 527 F. App'x 25, 31 (1st Cir. 2013) (citation omitted).

For the reasons set forth above, Claims 25(b), 26(b) and 27(b) will be DISMISSED because Mr. Smith fails to demonstrate a substantial burden on his religious exercise.

### (d)  Loss of Three Tapes and Five Books

Taken in the light most favorable to Mr. Smith, the record indicates that Defendants lost eight tapes and five books Mr. Smith ordered from The Final Call.  Nevertheless, Mr. Smith can currently access at least five tapes of Minister Farrakhan's sermons, which came from The Final Call, in the Chaplain's Library.  Additionally, given the abundant access to the sermons of Minister Farrakhan described in conjunction with the analysis of Claims 25(b) through 27(b), *see supra* Part III.B.2(a), Mr. Smith's fails to demonstrate the loss of these tapes imposed a substantial burden on his religious exercise.  With respect to the five religious books, Mr. Smith fails to provide any description of their content that would allow a reasonable finder of fact to conclude that their loss imposed a substantial burden on his religious exercise.[28] *See id.* Moreover, the record indicates that the books were lost, rather than banned.  Thus, Mr. Smith could simply reorder them.  While such loss may provide the basis for a state tort claim, *see Blount v. Tate*, No. 7:11CV00091, 2012 WL 1022336, at *4 (W.D. Va. Mar. 26, 2012) (citations omitted), it fails to demonstrate a violation of Mr. Smith's rights under RLUIPA.  *Living Water Church of God*, 258 F. App'x at 739 (concluding no substantial burden where government action

---

[28] Mr. Smith swears that:

> Without said cassette tapes and said books, I was not able to practice my five (5) daily prayers, was not able to preach my Islamic faith to those who wished to learn it, and was not able to participate in religious classes, congregate worship service, and study group discussions as mandated by my religious beliefs and practices.

(Smith Aff. #4 ¶ 7.) Conclusory assertions of this ilk fail to demonstrate that the lack of tapes and audio cassettes imposed a substantial burden on Mr. Smith's religious exercise. *Krieger*, 496 F. App'x at 326; *see United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (citation omitted) (internal quotation marks omitted) (concluding that "[a]iry generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . .").

merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion). Accordingly, Claim 22(b) will be DISMISSED.

### C.     First Amendment Free Exercise Claims

Similar to RLUIPA, in order for Mr. Smith to survive summary judgment for his First Amendment claim, Mr. Smith must demonstrate that Defendants' conduct substantially burdened his religious exercise. *Whitehouse*, 2011 WL 5843622, at *5. "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As explained above, Mr. Smith has failed to demonstrate a substantial burden on his religious exercise with respect to the allegations in Claims 22(a) and 25(a). Accordingly, Claims 22(a) and 25(a) will be DISMISSED.

In Claims 20(a) and 23(a), Mr. Smith contends that Defendants violated his Free Exercise rights by prior versions of the CD policy that limited his access to CDs containing the sermons of Minister Farrakhan. The relevant time period for these claims is August 11, 2009 through April 30, 2010. During this period, Mr. Smith retained any recordings of Minister Farrakhan's sermons that he possessed prior to the adoption of the 2009 Policy. Additionally, Mr. Smith could obtain portions of Minister Farrakhan's sermons from The Final Call in its newspaper and order books of Minister Farrakhan's teachings from The Final Call. Given Mr. Smith's access to Minister Farrakhan's sermons in these formats, Mr. Smith fails to demonstrate that the 2009

Policy imposed a substantial burden on his religious exercise.[29] *See Dunlap v. Losey*, 40 F.

App'x 41, 43 (6th Cir. 2002) (concluding plaintiff failed to demonstrate substantial burden on his

religion exercise by the temporary deprivation of a hardcover Bible, where plaintiff could have

obtained a softcover Bible).

 Even if the prior versions of the policy imposed a substantial burden, they pass

constitutional muster because they were rationally related "to legitimate penological interests."

*Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

> A prison regulation is reasonable and thus permissible if it satisfies the four factors established in *Turner v. Safley*, 482 U.S. 78 (1987). That test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action.

*Wall*, 741 F.3d at 499 (parallel citation omitted) (quoting *Lovelace*, 472 F.3d at 200). "The

burden, moreover, is not on the State to prove the validity of prison regulations but on the

prisoner to disprove it." *Overton*, 539 U.S. at 132 (citations omitted).

 Defendants' prior CD policies, discussed in Claims 20(a) and 23(a), easily pass the above

test. *See Marron*, 2014 WL 585850, at *6 (concluding "the single vendor policy is the least

restrictive means of furthering [a] compelling government interest" and thus did not violate

RLUIPA); *see Wall*, 741 F.3d at 499 n. 10 (citation omitted) (explaining that, "in the prison

context, the First Amendment affords prison officials greater latitude than RLUIPA"). As

explained by Defendant Robinson, the single vendor policy furthers prison security because it

"decreases the chances of contraband entering the prisons and CDs being pirated or tampered

---

[29] Thus, to the extent that Claims 20(b), 21(b), 23(b) and 24(b) are not moot, *see supra* Part III.A, they lack merit because Mr. Smith fails to demonstrate a substantial burden on his religious exercise.

with, for example, discs being switched or information being recorded over the existing content." (Robinson Aff. ¶ 7.) Thus, the first *Turner* factor favors Defendants.

Second, even under the prior versions of the CD policy, Mr. Smith retained a host of methods of practicing his faith. Mr. Smith retained cassette tapes of sermons he possessed prior to the institution of the single vendor policy. Additionally, Mr. Smith remained free to study and obtain a variety of written material relevant to his faith. Thus, the second factor also favors Defendants. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987) ("We think this ability on the part of respondents to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable.").

Third, Mr. Smith's desire to purchase CDs directly from The Final Call would have a significant impact on prison resources. "If inmates had been allowed to order from their vendors of choice, VDOC would have been forced to expend valuable resources to review each vendor and each [CD] entering its facilities." *Marron*, 2014 WL 585850, at \*6 (citation omitted). Finally, Mr. Smith fails to demonstrate that any obvious, easy alternatives to Defendants' prior CD policies existed. *See Coleman v. Jabe*, 7:11cv00518, 2013 WL 4084762, at \*3-4 (W.D. Va. Aug. 13, 2013) (concluding "single-vendor prayer-oil policy is the least restrictive means of furthering the compelling governmental interests of security and cost control"). As Defendants' prior CD policies pass muster under the *Turner* test, Claims 20(a) and 23(a) will be DISMISSED.

### D.  Equal Protection

"The [Equal Protection] Clause requires that similarly-situated individuals be treated alike." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). "In order to make out a claim under the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from

34

others similarly situated and that the unequal treatment was the result of intentional discrimination." *North v. Clarke*, No. 3:11-CV-211, 2011 WL 3321482, at *6 (E.D. Va. Aug. 2, 2011) (citing *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (internal quotation marks omitted) (citation omitted).[30]

### 1.   Claim 26(a)

In Claim 26(a), Mr. Smith essentially asserts that Defendants violated his rights under the Equal Protection Clause by limiting the purchase of CDs to a single vendor, while permitting the purchase of magazines and other publications from any approved vendor.  Defendants cogently explain:

> CDs present special challenges to the VDOC because the content can be altered or supplemented without the changes being readily observable (short of listening to the entire disc).  Therefore, a physical search of the CD is not sufficient to answer all security concerns.  By using a single vendor, the VDOC decreases the chances of contraband entering the prisons and CDs being pirated or tampered with, for example, discs being switched or information being recorded over the existing content.

(Robinson Aff. ¶ 7.)  "[T]he Constitution does not require 'things which are different in fact or opinion to be treated in law as though they were the same.'"  *O'Bar v. Pinion*, 953 F.2d 74, 81 (4th Cir. 1991) (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)).  Mr. Smith fails to demonstrate that, as an inmate petitioning to purchase CDs, he is similarly situated to inmates seeking to purchase other publications.  *See Harvey v. Town of Merriville*, 649 F.3d 526, 532 (7th Cir. 2011) ("Without a similarly situated comparator, the [plaintiffs'] equal protection claim cannot hold water.").  Accordingly, Claim 26(a) will be DISMISSED.

---

[30] No evidence exists that any of Defendants' CD policies were motivated by an intent or desire to discriminate against Mr. Smith because he is a member of the Nation of Islam.

## 2.   Claim 27(a)

In Claim 27(a), Mr. Smith contends that Defendants violated his right to equal protection

because, while they denied him the ability to purchase CDs of Minister Farrakhan's sermons

directly from The Final Call, they permitted another inmate, Alonzo X Hunter, to purchase these

CDs directly from The Final Call.  In support of this claim, Mr. Smith directs the Court to sworn

declaration from Alonzo Hunter.  Hunter swears:

> I am an observant member of the Nation of Islam under the leadership of
> the Honorable Minister Louis Farrakhan.
> From 2011 until around July 2012, I was authorized to purchase and
> receive compact discs of sermons by Minister Farrakhan <u>DIRECTLY</u> from The
> Final Call, Inc., located at 734 W. 79th Street, Chicago, Illinois 60620, while
> confined at Saint Brides Correctional Center, Chesapeake, Virginia.
> *The prison officials at Saint Brides indicated to me that said authorization*
> *had been given by David A. Robinson, Chief of Operations of the Virginia*
> *Department of Corrections,* as a result of a grievance I had filed about this matter.
> Between the date of said authorization and around July 2012, I purchased
> and received a minimum of seventy-five (75) compact discs of sermons by
> Minister Farrakhan directly from The Final Call, Inc.
> I was permitted to retain possession of each of these seventy-five (75)
> discs until I decided to send them home.

(Hunter Decl. ¶¶ 2-5 (paragraph numbers omitted) (punctuation corrected) (emphasis added).)

Hunter's statement, indicating that Defendant Robinson was the individual who authorized

Hunter's purchase and possession of CDs from The Final Call, however, constitutes inadmissible

hearsay. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)

(citations omitted) ("[S]ummary judgment affidavits cannot be conclusory or based upon

hearsay.").[31]

While the record establishes that Hunter was treated differently than Mr. Smith with

respect to purchases, Mr. Smith fails to demonstrate any personal involvement by Defendants

---

[31] Defendant Robinson swears that he has "no personal knowledge or recollection regarding
Smith's allegation that [he] gave approval to Alonzo Muhammad to purchase for his personal
possession CDs from the Final Call, Inc.  As stated previously, the current policy restricts CD
purchases to approved CDs offered for sale by MBM." (Robinson Aff. ¶ 9.)

with respect to the decision to permit Hunter to obtain CDs of Minister Farrakhan's sermons from The Final Call. *See, e.g., Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."). "To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant knew of a deprivation and 'approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated.'" *Oakley v. Cowan*, 187 F. App'x 635, 638 (7th Cir. 2006) (some internal quotation marks omitted) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). "Absent direct participation, there must at least be a showing that the defendants 'acquiesced in some demonstrable way' in the alleged violation." *Id.* (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)). As Mr. Smith has produced no such evidence with respect to Defendants, Claim 27(a) will be DISMISSED.

### 3.    Claims 21(a) and 24(a)

In Claims 21(a) and 24(a), Mr. Smith contends that Defendants violated his right to equal protection between August 11, 2009 and April 30, 2010. As discussed above, the VDOC's 2009 Policy permitted the purchase of musical CDs, but prohibited the purchase of any non-musical CDs, such as the sermons of Minister Farrakhan. As explained below, no need exists to determine whether the 2009 Policy passed muster under the Equal Protection Clause because Defendants are entitled to qualified immunity with respect to Mr. Smith's demands for monetary damages for Claims 21(a) and 24(a).

Under the doctrine of qualified immunity, a government official is not personally liable for damages resulting from his or her actions if his or her "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). "Qualified immunity 'strikes a balance between compensating those who have been injured by official conduct and

37

protecting government's ability to perform its traditional functions.'" *Braun v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (quoting *Wyatt v. Cole*, 504 U.S. 158, 167 (1992)). The doctrine "ensures that officials are not unfairly strung up for money damages as a result of 'bad guesses in gray areas.'" *Id.* (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

"To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not . . . shown facts that 'make out a violation of a constitutional right,' or that (2) 'the right at issue was [not] 'clearly established' at the time of' its alleged violation." *Owens v. Baltimore City State's Att'ys Office*, 767 F.3d 379, 395-96 (4th Cir. 2014) (alteration in original) (emphasis added) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Where, as here, a case is readily dismissed because the right was not clearly established, the Court may proceed directly to that prong. *Pearson*, 555 U.S. at 236; *see id.* at 239 ("[T]here will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all."). "[T]he availability of the qualified immunity defense makes it unnecessary to take up the merits of [Mr. Smith's] constitutional challenge." *West v. Murphy*, 771 F.3d 209, 214 (4th Cir. 2014) (citing *Pearson*, 555 U.S. at 236).

"Before proceeding to [either prong of the] qualified immunity test, 'our first task is to identify the specific right that [Mr. Smith] asserts was infringed by the challenged conduct, recognizing that the right must be defined at the appropriate level of particularity.'" *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013) (citing *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997)). The Court must "define the right in question at a high level of particularity and be mindful of the specific context of the case." *West*, 771 F.3d at 215-16 (internal quotation marks omitted) (citations omitted). So defined, the Court must ascertain whether between

38

August 11, 2009 and April 30, 2010, a Virginia prisoner's right to equal treatment for musical and nonmusical compact discs was clearly established.

"The law is clearly established if 'the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* at 213 (some internal quotation marks omitted) (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)). "The universe of existing precedent [for assessing whether a right is clearly established] is not unlimited." *Id.* Rather, the Court "'need not look beyond the decisions of the Supreme Court, the [Fourth Circuit], and the highest court of the state in which the case arose.'" *Id.* (some internal quotation marks omitted) (quoting *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012)).

As of April 30, 2010, none of the above sources clearly established a prisoner's right to have musical CDs and non-musical CDs treated the same. Because the right at issue was not clearly established, Defendants are entitled to qualified immunity. *Cf. North*, 2012 WL 405162, at *9-10 (concluding that the VDOC policy that allowed CDs with music or religious content, but prohibited secular, non-music CDs (or secular, spoken-word CDs), violated the First and Fourteenth Amendments, but the defendants were nevertheless entitled to qualified immunity).[32] Accordingly, Claims 21(a) and 24(a) will be DISMISSED.

Mr. Smith has moved for summary judgment with respect to Claims 21(a), 21(b), 24(a), 24(b), 26(a) and 26(b). As the record demonstrates that Mr. Smith is not entitled to any relief with respect to these claims, Mr. Smith's Motions for Partial Summary Judgment (ECF Nos. 60, 81) will be DENIED.

---

[32] For similar reasons, Defendants would be entitled to qualified immunity with respect to Mr. Smith's demands for monetary damages in conjunction with Claims 20(a) and 23(a).

### IV. Conclusion

Mr. Smith's Motion for Leave to File Supplemental Brief in Support of Motion for

Partial Summary Judgment (ECF No. 82) will be GRANTED. Mr. Smith's demands for

injunctive and declaratory relief with respect to Claims 20, 21, 23, and 24 will be DISMISSED

AS MOOT. Claims 20(b), 21(b), 23(b), and 24(b) will be DISMISED AS MOOT. Because Mr.

Smith fails to demonstrate a substantial burden, Claims 22(a), 22(b), 25(a), 25(b), 26(b), and

27(b) will be DIMISSED. Claims 21(a) and 24(a) will be DISMISSED because Defendants are

entitled to qualified immunity. Claims 20(a), 23(a), 26(a) and 27(a) will be DISMISSED as Mr.

Smith's claims lack merit. Defendants' Motion for Summary Judgment (ECF No. 53) will be

GRANTED. Mr. Smith's Motions for Partial Summary Judgment (ECF Nos. 60, 81) will be

DENIED. Mr. Smith's Motion for Sanctions (ECF No. 83) will be DENIED.

Mr. Smith has filed a Motion to Strike. In the Motion to Strike, Mr. Smith requests that

the Court strike portions of the Defendants' Answer. As Defendants' Answer is not relevant to

the Court's resolution of this action, the Motion to Strike (ECF No. 86) will be DENIED AS

MOOT.

The action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

It is so ORDERED.

                                              /s/
                                    Roderick C. Young
                                    United States Magistrate Judge

Date: March 6, 2015
Richmond, Virginia